IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COTTONWOOD FINANCIAL LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-1650-N |
| | § | |
| THE CASH STORE FINANCIAL | § | |
| SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

## OPINION

This Order addresses Plaintiff Cottonwood Financial Ltd.'s, ("Cottonwood") motion

for a preliminary injunction [10] and Defendant The Cash Store Financial Services, Inc.'s,

("CSFS") motion to dismiss [14]. Because Cottonwood shows a substantial likelihood of

prevailing on the merits of its claim for dilution under Texas law, the Court grants

Cottonwood's motion and enjoins CSFS to a limited extent as set forth in this Order. And,

although the Court determines that it does have subject matter jurisdiction to hear this

dispute, Cottonwood fails to state claims for relief under the Lanham Act. The Court

therefore grants in part and denies in part CSFS's motion to dismiss.

## I. ORIGINS OF THE COTTONWOOD–CSFS TRADEMARK DISPUTE

This case concerns a cross-border trademark dispute between two businesses engaged

in the short-term, "payday" consumer lending industry. Cottonwood has operated its "CASH

STORE" lending centers for almost fifteen years. In that time, Cottonwood has expanded

its presence to seven states: Idaho, Illinois, Michigan, New Mexico, Texas, Utah, and Wisconsin. CSFS operates or has interests in stores offering similar services in Canada, Australia, and the United Kingdom. Although CSFS has changed its name twice since its founding, first as "B&B Capital" and then "Rentcash, Inc.," its lending centers have operated under the trade name "The Cash Store" for approximately ten years. Until this dispute, Cottonwood and CSFS operated without interference from either side. Indeed, the companies' founders did not know of the other's existence for some time.

CSFS fueled its expansion in part through capital raised through the Toronto Stock Exchange, selling under the ticker symbol "CSF." In addition to its capital raising activities in Canada and elsewhere, CSFS gives presentations at investment conferences in the United States and engages in other forms of "investment solicitation activities."[1] American investors have held stock in CSFS for at least the last four years. In June 2010, CSFS obtained listing on the New York Stock Exchange ("NYSE") as "The Cash Store Financial Services, Inc.," under the ticker symbol "CSFS."

Cottonwood then filed this action for trademark infringement and unfair competition under the Lanham Act and for trademark dilution under Texas law. Cottonwood broadly

---

[1]These activities include "(i) listing CSFS shares on the NYSE; (ii) making regulatory filings with the [SEC]; (iii) appearing at conferences in the U.S. attended by potential investors and other participants in the U.S. securities marketplace; (iv) disseminating press releases and other public communications in the U.S. to 'analysts, investors, and potential investors' for the purpose of promoting investments in CSFS; and (v) hosting Internet webcasts accessible to 'analysts, investors, and potential investors located in the United States.'" Mot. to Dismiss at 6 [14-1] (internal citations omitted) (citing Compl. [1]).

argues that the combination of CSFS's prominent use of the term "cash store," continuing investment solicitation activities in the United States, and listing on the NYSE are likely to cause confusion between the two entities' marks and to dilute Cottonwood's "CASH STORE" marks. CSFS now moves to dismiss for lack of subject matter jurisdiction and failure to state a claim under Rules 12(b)(1) and 12(b)(6), and Cottonwood moves to preliminarily enjoin CSFS on its trademark infringement and Texas law dilution claims. The Court addresses each of these motions in turn.

## II. THE COURT HAS SUBJECT MATTER JURISDICTION OVER COTTONWOOD'S CLAIMS

CSFS moves to dismiss under Rule 12, arguing that the Court lacks subject matter jurisdiction over Cottonwood's claims and that Cottonwood fails to state claims. As mandated by Fifth Circuit caselaw, the Court first addresses CSFS's contention that it lacks subject matter jurisdiction under Rule 12(b)(1). *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

### A. Rule 12(b)(1) Standard

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citing *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)) "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may

be in dispute," *Ramming*, 281 F.3d at 161 (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)), and should "grant[] [the motion] only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders*, 143 F.3d at 1010).[2]  In reality, "the federal courts have followed a general practice of granting jurisdiction in most cases and dismissing for lack of subject matter jurisdiction only under narrow circumstances." *Nowak*, 81 F.3d at 1188.  The plaintiff bears the burden of proof in the Rule 12(b)(1) context.  *See Ramming*, 281 F.3d at 161.

### B. CSFS Places Undue Reliance on Sterling Drug v. Bayer AG

CSFS contends that the Court must dismiss Cottonwood's action under Rule 12(b)(1) "[t]o the extent [it] seeks an injunction that would affect the use of CSFS's trademark and trade name in Canada."  Mot. to Dismiss at n.1.  Although CSFS's subject matter jurisdiction arguments overlap somewhat with its arguments under Rule 12(b)(6), the crux of CSFS's 12(b)(1) contention appears to consist of CSFS's belief that it "has the limited right, irrespective of the rights of a domestic trademark holder, to access U.S. capital markets, sell shares to U.S. consumers and communicate with U.S. investors and potential investors, even if it is barred from using a trademark that infringes the rights of another in connection with goods or services offered in this country to consumers." *Id.* at 14.  According to CSFS, then, foreign entities may engage in investment solicitation activities in the United States under

---

[2]Query whether courts should continue to conduct this old-school Rule 12(b)(6)-like analysis in light of the Supreme Court's recent decisions in *Twombly* and *Iqbal*.  *See Bell Atl. Corp v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

a trade name and marks valid in another country, even if another entity has superior rights to the marks under U.S. law, so long as the foreign company does not provide the same goods and services within the United States as the senior user. *Id.*

For support, CSFS primarily relies on *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994), a case involving a dispute between companies – one American (Sterling Drug) and one German (Bayer AG) – owning various interests in the marks and trade names used by the venerable Bayer company prior to the First World War. Sterling Drug had long and prominently used the Bayer marks on its aspirin products in the United States. Sterling brought claims under the Lanham Act and the New York anti-dilution statute against Bayer AG, which used the Bayer marks primarily on its chemical, healthcare, and imaging products. Notably, resolution of the *Sterling Drug* dispute also involved interpreting a series of agreements that had governed the parties' co-existence for several decades. *See Sterling Drug, Inc. v. Bayer AG*, 792 F. Supp. 1357 (S.D.N.Y. 1992). The *Sterling Drug* district court entered a broad injunction against Bayer AG that prohibited it from using the Bayer marks in a wide variety of contexts, even going so far as to enjoin it from using any name with the word "Bayer" even though the German company's U.S. subsidiary was named "Bayer USA." *See* 14 F.3d at 744-45, 748-50.

Ultimately, CSFS asks the Court to give *Sterling Drug* a persuasive load that it cannot bear. Although *Sterling Drug* "vacated the district court's injunction to the extent it restricted the defendant's ability to raise capital in the U.S. or to communicate with its U.S.

shareholders,"[3] it "also held that it would not be appropriate to allow the defendant to promote its U.S. business under the guise of soliciting investments." Def.'s Mot. to Dismiss at 13-14. And, it nowhere suggests that even pure "investment solicitation activities" may proceed unfettered. Rather, the court noted that any injunctive relief must "accommodate Bayer AG's global business interest's [sic] in raising capital and communicating with its subsidiaries." *Sterling Drug*, 14 F.3d at 750. Indeed, the opinion explicitly provides, in a portion omitted in the block-quoted text supplied by CSFS, that on remand "the District Court [could] require an appropriate disclaimer" as an appropriate injunctive remedy. *Sterling Drug*, 14 F.3d at 750.

This simply reflects the Second Circuit's adherence to the universally accepted proposition that "the Lanham Act demands that injunctive relief be 'no broader than necessary to cure the effects of the harm caused.'" *Id.* (quoting *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1542 (2d Cir. 1992)) (further citations omitted). Under the circumstances, "[a] near total ban on Bayer AG's use of the mark [was] not necessary to protect Sterling's trademark." *Id.* The court reasoned that "[a]s long as Bayer AG confine[d] its use within appropriate bounds, any incidental adverse impact on Sterling's trademark would be too insignificant to justify preventing Bayer AG from raising capital in the United States and communicating with its shareholders under its own name." *Id.*

---

[3]The Second Circuit believed this to be one potential consequence of the injunction provision "prohibit[ing] Bayer AG from identifying itself by using the 'Bayer' mark in the United States." *Sterling Drug*, 14 F.3d at 749-50.

Instead of demonstrating that the Court may not regulate CSFS's use of the term "Cash Store" in investment solicitation activities, then, *Sterling Drug* supports the Court's exercise of subject matter jurisdiction in this case. Although Cottonwood's complaint seeks expansive relief that may directly or indirectly impact CSFS's Canadian operations, that possibility does not divest the Court of jurisdiction. As CSFS recognizes, Cottonwood does not seek an extraterritorial injunction reaching CSFS's activities in Canada. Def.'s Mot. to Dismiss at 5, 6 & n.2. Accordingly, to the extent an injunction would impact CSFS's activities in Canada or elsewhere, that effect would result from regulating activity occurring within the United States.[4] And, "[c]ourts have repeatedly distinguished between domestic acts of a foreign infringer and foreign acts of that foreign infringer; the extraterritoriality analysis to determine jurisdiction attaches only to the latter." *McBee v. Delica Co., Ltd.*, 417 F.3d 107, 122 (1st Cir. 2005) (citing, *inter alia*, *Sterling Drug*, 14 F.3d at 744-47 & n.8). Thus, the Court need not conduct an extraterritoriality analysis under *Steele v. Bulova Watch*

---

[4]*Cf. Sterling Drug*, 14 F.3d at 746 n.7 (observing that "[w]hile it is true that the injunction seeks to reach only the *domestic* effects of Bayer's *conduct*, it does so through the mechanism of an *extraterritorial injunction*, *i.e.*, one that prohibits Bayer AG from undertaking certain actions outside U.S. borders") (emphasis in original). Here, Cottonwood does not seek this "more modest goal of limiting foreign uses that reach the United States." *Id.* And, even if it did, *Sterling Drug* nonetheless would support the Court's exercise of jurisdiction. 14 F.3d at 747 ("Upon remand, the District Court may grant an extraterritorial injunction carefully crafted to prohibit only those foreign uses of the mark by Bayer AG that are likely to have significant trademark-impairing effects on United States commerce," such as "requiring Bayer AG to take appropriate precautions against using the mark in international media in ways that might create confusion among United States consumers"). *See also McBee v. Delica Co., Ltd.*, 417 F.3d 107, 120 (1st Cir. 2005); *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956).

*Co.*, 344 U.S. 280 (1952) (extraterritorial application of Lanham Act), and *Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 701 F.2d 408, 414 & n.8 (5th Cir. 1983) [hereinafter *American Rice I*] (articulating factors to consider in exercising extraterritorial jurisdiction under the Lanham Act and establishing that, in the Fifth Circuit, a plaintiff need only show "some," rather than a substantial, effect on United States commerce to exercise extraterritorial jurisdiction (citing *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956))).[5]

Cottonwood eventually may obtain the full range of its sought-after relief, limited disclaimer relief – as the Court determines it shows a substantial likelihood of doing in the preliminary injunction analysis below – some other form of relief, or no relief at all. Regardless, at this juncture it remains far from "certain that [Cottonwood] cannot prove any

---

[5]*American Rice I* considered the relevant factors there to "include the citizenship of the defendant, the effect on United States commerce, and the existence of a conflict with foreign law." 701 F.2d at 414 (citing *Vanity Fair*, 234 F.2d at 642); *see also Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 327-28 (5th Cir. 2008) [hereinafter, *American Rice II*]. The Fifth Circuit, however, noted that "[t]he absence of any one of these [factors] is not dispositive. Nor should a court limit its inquiry exclusively to these considerations. Rather, these factors will necessarily be the primary elements in any balancing analysis." *American Rice I*, 701 F.2d at 414 & n.9 (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428-29 (9th Cir. 1977)).

These factors, moreover, are more "properly understood not as questions of whether a United States court possesse[s] subject matter jurisdiction, but instead as issues of whether such a court should decline to exercise the jurisdiction that it possesse[s]." *McBee*, 417 F.3d at 120 (drawing analogy to exercise of jurisdiction in the antitrust context (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993))). Thus, neither the fact that CSFS owns valid trademark rights to its "Cash Store" marks in Canada nor CSFS's Canadian citizenship automatically place its foreign activities outside the Court's jurisdiction.

set of facts in support of [its] claim[s] that would entitle [it] to relief." *Ramming*, 281 F.3d at 161 (citing *Home Builders*, 143 F.3d at 1010).  And, the complaint does not suggest that Cottonwood seeks to bar CSFS from exercising its Canadian trademark rights in Canada. Accordingly, the Court properly exercises subject matter jurisdiction.

### III. COTTONWOOD STATES A CLAIM ONLY FOR DILUTION UNDER TEXAS LAW

CSFS next argues that the Court must dismiss Cottonwood's claims under Rule 12(b)(6) "[t]o the extent the Complaint fails to assert any use by CSFS of designations in the U.S. in connection with the offering of goods and services, or otherwise seeks relief against an international trademark owner that is outside the scope of U.S. law."  Def.'s Mot. to Dismiss at 2 n.1.  Because the preceding discussion of subject matter jurisdiction also establishes that Cottonwood brings claims only for CSFS's activities within the United States, the Court need not rehash CSFS's extraterritoriality-based arguments here.  The remainder of CSFS's argument of Rule 12(b)(6), then, essentially boils down to the claim that Cottonwood's complaint must fail because CSFS's investment solicitation activities "do not constitute the sale, distribution or advertising of goods and services as required for a violation under either federal or Texas law."  *Id.* at 6.

### A. Rule 12(b)(6) Standard

When faced with a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has asserted a legally sufficient claim for relief.  *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).  According to the Supreme Court, a viable complaint must

include "enough facts to state a claim to relief that is plausible on its face," i.e., "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). A plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

As the Supreme Court recently observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty,*] 490 F.3d 143, 157-158 [(2d Cir. 2007)]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more

than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949-50.

In ruling on a Rule 12(b)(6) motion, the court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

### B. The Lanham Act May Reach "Commerce" Outside the United States

To sustain a claim under the Lanham Act, a plaintiff must show that the defendant "uses (1) any reproduction, counterfeit, copy[,] or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution[,] or advertising of any goods" or services; "(5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) [hereinafter, *American Rice II*] (citing *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004, 1009-10 (5th Cir. 1975)) (alterations in original). The parties devote a substantial portion of their briefs to whether Cottonwood must claim that CSFS uses the "Cash Store" marks while providing goods or services within the United States and whether CSFS solicits investments "in connection" with goods or services. Accordingly, the Court reads the motion to dismiss to implicate the third and fourth elements.

The Court agrees with Cottonwood that the plain language of the Lanham Act may extend to activities similar to those at issue here.  As an initial matter, and as suggested by the existence of caselaw concerning the Lanham Act's extraterritorial application, none of the relevant statutory provisions prohibits their application to extraterritorial uses of protected marks.  *See* 15 U.S.C. § 1114(1)(a) (infringement); 15 U.S.C. § 1125(a) (unfair competition); *see also McBee*, 417 F.3d at 119 ("[I]t is beyond much doubt that the Lanham Act can be applied against foreign corporations or individuals in appropriate cases; no court has ever suggested that the foreign citizenship of a defendant is always fatal." (citing *Sterling Drug*, 14 F.3d at 746; *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 429 (9th Cir. 1977))).

The Lanham Act requires only that the defendant use the relevant marks in "commerce," which it "sweepingly define[s] as 'all commerce which may lawfully be regulated by Congress.'"  *American Rice I*, 701 F.2d at 413 (quoting 15 U.S.C. § 1127).  Among other things, Congress may regulate foreign commerce, U.S. CONST. art. I, § 8, cl.3, and securities.  *See, e.g.*, 15 U.S.C. § 77a, *et seq.* (Securities Act of 1933); 15 U.S.C. § 78a, *et seq.* (Securities and Exchange Act of 1934).[6]  Accordingly, provided that Cottonwood

---

[6]*See, e.g.*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003) (relying on foreign commerce power in trademark infringement context); *accord McBee*, 417 F.3d at 119 ("When the purported infringer is not an American citizen, and the alleged illegal activities occur outside the United States, then the analysis is different [than if the infringer were an American citizen], and appears to rest solely on the foreign commerce power.").

asserts that CSFS uses in commerce or commits acts likely to dilute Cottonwood's marks, Cottonwood need not show that CSFS provides goods and services in the United States to maintain its claims.[7]

### C. Cottonwood States a Claim for Dilution Under Texas Law

The question, however, remains whether investment solicitation activities have a sufficient nexus with goods or services used in commerce, or are themselves goods, services, or acts likely to dilute. Addressing the Texas statute first: Given the Court's preliminary injunction analysis below and the plain meaning of the word "act," investment solicitation activities constitute "acts." *See* BLACK'S LAW DICTIONARY 26 (8th ed. 2004) (defining "act" as (1) "[s]omething done or performed, esp[ecially] voluntarily; a deed" and (2) "[t]he process of doing or performing; an occurrence that results from a person's will being exerted on the external world"). Because the complaint alleges that CSFS's investment solicitation activities will dilute Cottonwood's "CASH STORE" marks and specifically describes those activities, *see, e.g.*, Compl. at 5, Cottonwood sufficiently pleads facts stating a claim for dilution by blurring under Texas law.[8]

---

[7]Because Cottonwood does not ask the Court to enjoin CSFS from using its marks and engaging in activities in Canada and as allowed under Canadian law, the Court need not address whether the Texas anti-dilution statute applies extraterritorially.

[8]For a mark to be "considered to be used . . . in connection with goods" or "services" under Texas law, the use must occur within the State of Texas. TEX. BUS. & COM. CODE § 16.02. The Texas anti-dilution provision, however, contains nothing approximating the Lanham Act's "use in commerce" requirement that would cabin "act[s] . . . likely to dilute" to uses of a mark in connection with qualifying goods or services. *See Int'l Bancorp*, 329

### D. Cottonwood Fails to Show CSFS's Investment Solicitation Activities Use Cottonwood's Marks "in Commerce" or "in Connection with" Goods or Services

The Lanham Act's statutory definitions, however, require the opposite conclusion under federal law. To be sure, a cursory reading suggests otherwise. The Lanham Act's trademark infringement provisions apply to "[a]ny person who shall, without the consent of the registrant – (a) use in commerce . . . a registered mark in connection with the sale, offering for sale, distribution, *or advertising* of any goods or services . . . likely to cause confusion." 15 U.S.C. § 1114(1)(a) (emphasis added). Similarly, its unfair competition provision applies against "[a]ny person who, on or *in connection with any* goods or services, . . . uses in commerce any word, term, name, symbol, or device . . . likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A) (emphasis added). As noted above, Congress regulates securities, and the Fifth Circuit has suggested that "[b]y definition, a service mark is used in commerce 'when it is used or displayed in the sale or *advertising* of services.'" *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 197 (5th Cir. 1998) (quoting 15 U.S.C. § 1127) (emphasis in original). Coupled with CSFS's apparent admission that its investment solicitation activities "are all, at most, a form of advertising," *see* Def.'s Reply to Mot. to Dismiss at 7 [29], it would appear that

---

F.3d at 364 (noting that Lanham Act's "use in commerce" requirement to mandate, as it relates to services, that the mark be "used or displayed in the sale or advertising of services *and the services are rendered in commerce*" (emphasis in original) (quoting 15 U.S.C. § 1127)).

Cottonwood does state valid claims under the Lanham Act because CSFS essentially engages in advertising in the United States, in the form of soliciting investments, with an eye towards or "in connection with" using any capital raised to fund its Canada-based consumer lending services.

But, the Lanham Act uses the term "use in commerce" as a term of art. The *Elvis Presley* Court truncated the Lanham Act's full definition of "use in commerce." The full definition provides:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127. Critically, the advertising provision quoted in *Elvis Presley* is conjunctive; advertising constitutes a use in commerce "when [the mark] is used or displayed in the sale or advertising of services *and* the services are rendered in commerce." 15 U.S.C. § 1127; *see, e.g.*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 373 (4th Cir. 2003) (recognizing "the two distinct aspects of the statutory 'use in commerce' requirement" and that its "*conjunctive* command" mandates that "*both* elements must be distinctly analyzed") (emphasis in original).

Under this mode of analysis, Cottonwood fails to state viable trademark claims for three reasons. First, construing the relevant services here to refer to CSFS's consumer

lending operations abroad, CSFS's investment solicitation activities do not advertise services

"rendered in commerce."  Absent the exigent circumstances present in the extraterritoriality

cases cited above, Congress has no authority to regulate a foreign corporation's business

operations occurring entirely outside of the United States.  *See e.g.*, *McBee*, 417 F.3d at 120;

*Vanity Fair*, 234 F.2d at 642 ("[W]e do not think that Congress intended that the

infringement remedies in [section] 32(1)(a) [of the Lanham Act] and elsewhere should be

applied to acts committed by a foreign national in his home country under a presumably valid

trademark registration in that country."); *see also Luft v. Zande Cosmetic Co.*, 142 F.2d 536,

540 (2d Cir. 1944).  Because CSFS's foreign consumer lending operations abroad are not

services that Congress may regulate, they cannot constitute "commerce" under the Lanham

Act.[9] CSFS's investment solicitation activities, therefore, do not advertise services rendered

---

[9]*But see Int'l Bancorp*, 329 F.3d at 361, 363-70, 372-82 (holding that, based on
Congress's foreign commerce power, a foreign mark owner who "advertised its trademark
domestically, but only rendered services under it abroad," met the Lanham Act's "use in
commerce" requirement).  *International Bancorp*, however, presents facts readily
distinguishable from those at issue here.  There, the court found critical that the defendant's
casino and gambling services in Monaco were "rendered in commerce" because the
defendant showed a "singularly impressive commitment to building brand identity in the
United States," *id.* at 373, and American citizens traveled abroad to consume the defendant's
services.  Notably, the defendant even maintained a New York advertising office with a
million dollar budget.  The court's decision,  however, did not turn on this fact, because the
plaintiffs could not show that, at least for the defendant's casino operations at issue, the
office "did anything other than advertise the [foreign defendant's] mark."  *Id.* at 365.  The
office only provided services, in the form of booking reservations, in relation to the
defendant's resort enterprises.  *Id.*
   Cottonwood pleads facts insufficient to invoke the Foreign Commerce Clause.
Whatever the extent of CSFS's investment solicitation activities, Cottonwood points to no
facts connecting those activities to American citizens' visiting CSFS's "Cash Stores" abroad.

in commerce.  *See, e.g.*, *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103-05 (2d Cir. 1998) (citing,

*inter alia*, *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) and collecting

numerous T.T.A.B. cases); *see also General Healthcare, Ltd. v. Qashat*, 364 F.3d 332, 337

(1st Cir. 2004) (noting that "overseas sales" do not constitute "a 'use in commerce' within

the purview of the Lanham Act").[10]  Accordingly, under this interpretation, Cottonwood will

be unable to prove any set of facts showing that CSFS uses the "Cash Store" marks "in

commerce."  In any case, Cottonwood avers that it does not seek to reach CSFS's operations

abroad, and the Court does not read the complaint to suggest otherwise.

Second, considering the relevant services to consist of listing and trading stock on a

stock exchange, CSFS's investment solicitation activities constitute neither "advertising of

any goods or services," 15 U.S.C. § 1114(1)(a), nor uses in commerce "in connection with

any goods or services." 15 U.S.C. § 1125(a)(1).  Stocks, like other securities, are not goods.

Although, the Lanham Act does not define "goods," the Uniform Commercial Code, Article

2, does.  *See* U.C.C. § 2-103(1)(k) (2004).  That definition expressly excludes "investment

---

[10]As here, *Buti* involved a foreign entity advertising within the United States its services offered abroad.  The Second Circuit considered the issue one of first impression in the federal courts, but one familiar to the T.T.A.B.  "So that the issue [was] no longer in doubt,"and "in keeping with the TTAB's longstanding view," the *Buti* Court expressly held "that the mere advertising or promotion of a mark in the United States is insufficient to constitute 'use' of the mark 'in commerce,' within the meaning of the Lanham Act, where that advertising or promotion is unaccompanied by any actual rendering *in the United States or in 'commerce which may lawfully be regulated by Congress*,' of the services 'in connection with which the mark is employed.'"  139 F.3d at 105 (emphasis in original) (citing 15 U.S.C. § 1127; *United Drug*, 248 U.S. at 97).  The *International Bancorp* Court distinguished *Buti* and found it unpersuasive authority under its facts.  *See* 329 F.3d at 369.

securities under Article 8." *Id.* Article 8 defines "security" as "an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer," U.C.C. § 8-102(a)(15), and specifically provides that "[a] share or similar equity interest issued by a corporation . . . is a security." U.C.C. § 8-103(a). Given the U.C.C.'s widespread acceptance and use, the Court sees no reason to treat stocks as goods for trademark infringement purposes. Accordingly, to the extent Cottonwood claims that CSFS's investment solicitation activities are advertising for or in connection with the sale of stocks as goods, those claims must fail.

Whether listing and trading stock on a stock exchange constitutes services presents a closer question. CSFS relies heavily on *In re Canadian Pacific Ltd.*, 754 F.2d 992 (Fed. Cir. 1985), for the proposition that an entity does not provide a service when it offers or sells its own stock to the public. Neither the case itself nor any of the cases citing *Canadian Pacific* embraces specifically this conclusion. Rather, "the Federal Circuit appears to have endorsed the more limited proposition that shareholders cannot be considered 'other' than the corporation or part of the relevant 'public,' [protected by the Lanham Act] because they are 'in fact and in law' a corporation's 'owners,' and because 'all together they *are*' the corporation." *Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, 261 F. Supp. 2d 502, 514 n.15 (E.D. Va. 2003) (citing *Canadian Pacific*, 754 F.2d at 994 (emphasis in original)). Whether an entity provides a service when it lists its stock on a stock exchange and encourages the public to purchase and trade its stock appears to remain an open question.

Courts have cited *Canadian Pacific*, however, for the idea that a mark user provides services when it engages in the "performance of labor for the benefit" of "truly third parties." *Morningside Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d 133, 137-38 (citing 754 F.2d at 994-96). Cottonwood seizes on this, noting that stockholders, investors, and numerous others benefit from trading in securities. But, disagreement exists over whether "the activity merely be of *some* benefit to another, or whether it must be *primarily* for the benefit of another." *Huthwaite*, 261 F. Supp. 2d at 513 (emphasis in original) (deciding on "some" benefit standard). For its part, the Trademark Manual of Examining Procedure takes a "primarily for the benefit of another" approach. *See* TMEP § 13.01(a)(ii) ("To be a service, an activity must be primarily for the benefit of someone other than the applicant. . . . . Offering shares of one's own stock for investment is not a service, because these are routine corporate activities that primarily benefit the applicant.").[11]

Although both sides have some persuasive power, the Court elects to take a different approach. A "some" benefit analysis risks unreasonably enlarging the number of putative "services" to encompass a host of activities properly outside of the Lanham Act's ambit. On the other hand, a "primarily for the benefit of another" approach threatens to mire courts in

---

[11]Elsewhere, the TMEP interprets *Canadian Pacific* to stand for the proposition that "[o]ffering shares of one's own stock for investment and reinvestment, and publication of reports to one's own shareholders, are not services, because these are routine corporate activities that primarily benefit the applicant." TMEP § 1301.01(b)(iv) (5th ed. 2007).

assessing "which side in the circumstances got the better bargain." *Huthwaite*, 261 F. Supp. 2d at 513.

The more pertinent inquiry, and one consonant with the Lanham Act's concern with uses of a mark in commerce likely to cause confusion among the public, looks to whether the the mark user provides an alleged service that in "any material way" constitutes "a different kind of economic activity than what any provider of that particular product or service normally provides." TMEP § 13.01(a)(iii); *accord In re Dr. Pepper*, 836 F.2d 508, 509 (Fed. Cir. 1987) ("[I]t has become a settled principle that the rendering of a service which is normally 'expected or routine' in connection with the sale of one's own goods is not a registrable service whether denominated by the same or a different name from the trademark for its product.").[12] This approach more properly gives primacy to uses of a mark made in connection with the alleged infringer's actual business. *Cf. Int'l Bancorp*, 329 F.3d at 364 (noting that "a mark is used in commerce only if it accompanies services rendered in commerce, *i.e.*, it is employed appurtenant to an established business or trade that is in commerce").

Accordingly, listing stock on a stock exchange does not constitute a qualifying service under the Lanham Act. And, therefore, CSFS's investment solicitation activities neither advertise goods or services nor use Cottonwood's marks in commerce in connection with

---

[12]"This interpretation is a refinement of the basic principle that the service for which registration is sought must be rendered to others." *In re Dr. Pepper*, 836 F.2d at 509 (citing *Canadian Pacific*, 754 F.2d at 994).

goods and services. By definition, a corporation issues stock; it is an intrinsic characteristic of the corporate form. *See* BLACK'S LAW DICTIONARY 365 (8th ed. 2004) (defining corporation as "[a]n entity (usu[ally] a business) having authority under law to act as a single person distinct from the shareholders who own it and having rights *to issue stock* and exist indefinitely"). Public corporations routinely list shares on stock exchanges and conduct promotional investment solicitations activities to facilitate the sale and subsequent trading of their stock. Thus, when a member of the public purchases or trades CSFS stock, he does not "expect" to receive investment services from CSFS.[13] He may expect (or, more accurately, hope) to receive the benefits of ownership in return, but those benefits will flow from the market value of CSFS's activities as a provider of short-term consumer loans, as reflected in the price of CSFS's stock. And, when a member of the public encounters CSFS's investment solicitation activities, he understands that such activities are designed to raise capital for CSFS's primary business activity and increase the price of CSFS stock.

Finally, even if the Court assumes that CSFS's investment solicitation activities constitute advertising, Cottonwood – as it concedes[14] – can state no facts bringing that advertising within the Lanham Act's reach. Advertising in of itself is neither a good nor a service. *See Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 923 F.2d 923, 927 (2d Cir.

---

[13]Thus, Cottonwood's characterization of CSFS's activities as "capital investment services" and "equity capital investment" services recognized by the Patent and Trademark Office ("PTO") fails. Pl.'s Resp. to Mot. to Dismiss at 10 n.5 [23].

[14]*See* Pl.'s Resp. at 4 n.3.

1990) ("Assuming that [the] sale of [the party's] insurance expertise to others may be treated as a service under the Act, the advertising of this service, as distinguished from its performance, may not."); *In re Adver. & Mktg. Dev., Inc.*, 821 F.2d 614 (Fed. Cir. 1987) (distinguishing advertising for services from actually providing advertising services); *In re Dr. Pepper*, 836 F.2d at 509-10 ("Merely advertising one's own goods . . . was early held not to be a 'service' within the purview of sections 3 and 45 [of the Lanham Act]." (quoting *Ex parte Tampax Inc.*, 91 U.S.P.Q. 215 (Dec. Comm'r Pat. 1951))).

### E. Conclusion Concerning CSFS's Motion to Dismiss

The Court grants in part and denies in part CSFS's motion to dismiss. Contrary to CSFS's arguments, the Court concludes that it does have subject matter jurisdiction over Cottonwood's claims and that Cottonwood sufficiently states a claim for dilution under Texas Law. Cottonwood, however, fails to state claims under the Lanham Act. The Court now turns to address Cottonwood's motion for a preliminary injunction.

### IV. COTTONWOOD IS ENTITLED TO LIMITED INJUNCTIVE RELIEF ON ITS TEXAS LAW DILUTION CLAIM

For the reasons that follow, the Court enjoins CSFS from calling itself "Cash Store" or "The Cash Store" in its regulatory filings, communications, and investment solicitation activities directed at investors, analysts, or consumers in the United States. CSFS may continue to identify itself as "Cash Store Financial," "Cash Store Financial Services," "The Cash Store Financial Services, Inc.," "CSF," and "CSFS" provided, however, that it includes

in such activities a disclaimer stating (1) CSFS is a Canadian corporation; (2) CSFS is not affiliated with Cottonwood or its "CASH STORE" trade name; and (3) CSFS does not do business in the United States under the trade name "Cash Store" and neither owns nor provides any consumer lending services in the United States. CSFS may continue to use photographs and other depictions of its "Cash Store" locations in its regulatory filings, communications, and investment solicitation activities directed at the United States provided that they include the above disclaimer.

## A. Preliminary Injunction Standard

The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris County v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). To obtain a preliminary injunction, the movant must establish the following: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the preliminary injunction is denied; (3) that the potential injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the preliminary injunction will

not disserve the public interest. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).[15]

"[C]ourts in trademark cases have a responsibility to tailor the relief to the violation, a responsibility that includes consideration of disclaimers." *Westchester Media, LLC v. PRL USA Holdings, Inc.*, 214 F.3d 658, 674 (5th Cir. 2000). "As with injunctive relief generally, an equitable remedy for trademark infringement should be no broader than necessary to prevent the deception." *Id.* at 671 (citing *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987); *Better Bus. Bureau, Inc. v. Med. Dirs., Inc.*, 681 F.2d 397, 405 (5th Cir. 1982)).

### B. Cottonwood Shows a Substantial Likelihood of Success on its Dilution Claim

Dilution occurs when an activity diminishes a mark's ability "to clearly and unmistakably distinguish the source of a product." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 489 (5th Cir. 2004) (citing 15 U.S.C. § 1127); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 812 (Tex. App. – Austin 2001, pet. den.)). Dilution may manifest itself either through "'blurring', a diminution in the uniqueness or individuality of the mark, or . . . 'tarnishment,' an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the

---

[15]When seeking an injunction in the trademark infringement context, the plaintiff must make a threshold showing of the mark's protectability and the plaintiff's status as senior user. *See Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 844 (5th Cir. 1990). CSFS does not dispute either matter.

goodwill and reputation associated with the plaintiff's mark." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1081 (5th Cir. 1997) [hereinafter *Oxxford*] (citing 3 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION §§ 24:67-69 (2d ed. 1984) [herinafter MCCARTHY]; *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965-66 (2d Cir. 1996)); *see also Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex. App. – Dallas 2001, no pet.).

At least twenty-five states and the federal government have enacted "anti-dilution" statutes that afford mark owners remedies against those engaging in dilution-causing activities. Texas's anti-dilution statute provides that

> [a] person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. An injunction sought under this section shall be obtained pursuant to Rule 680 *et seq.* of the Texas Rules of Civil Procedure.

TEX. BUS. & COM. CODE § 16.29.

As with other "garden variety" state anti-dilution statutes, *Oxxford*, 109 F.3d at 1084, the Texas statute encompasses a broader array of potentially impermissible uses of protected marks than the Federal Trademark Dilution Act ("FTDA") (codified as amended by the Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730 ("TDRA"), at 15 U.S.C. § 1125(c)), because a party invoking the Texas statute's protection need not

show the mark qualifies as famous.[16] *See, e.g.*, *Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car, Co.*, 238 F.3d 378, 381 (5th Cir. 2001) (noting that "[t]he Texas anti-dilution statute explicitly requires only distinctiveness, not fame" and that "[c]ourts applying the statute have not required fame for a party to prevail on a dilution claim").[17] "In order to succeed on a

---

[16]As originally enacted by Congress in 1995, the FTDA provided mark owners injunctive relief "against another person's commercial use in commerce of a mark or trade name, if such use . . . *causes dilution* of the distinctive quality of the mark." Pub. L. 104-98, § 3(a), 109 Stat. 985 (1996) (emphasis added). The circuits promptly split over whether the FTDA required plaintiffs to show actual dilution or, in the vein of the state anti-dilution statutes, a mere likelihood of dilution. *Compare Westchester Media, LLC v. PRL USA Holdings, Inc.*, 214 F.3d 658, 670-671 (5th Cir. 2000) (actual dilution), *and Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449 (4th Cir. 1999) (actual dilution), *with Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000) (likelihood of dilution), *and Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999) (likelihood of dilution). The Supreme Court resolved the split by interpreting the FTDA's plain language to "unambiguously require[] a showing of actual dilution." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003) (reversing the Sixth Circuit's likelihood of dilution interpretation, 259 F.3d 464 (2001)).

In response, Congress passed the TDRA in 2006. The TDRA abrogated *Moseley* by expanding the FTDA's reach to uses "likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). The TDRA amendments also added a definition for dilution by blurring and enumerated six nonexclusive factors courts should consider in determining whether a particular use will likely cause dilution by blurring. 15 U.S.C. § 1125(c)(2)(B).

[17]Prior to the FTDA, the Texas anti-dilution statute also "offer[ed] broader protection for [a] [p]laintiff's service marks than federal law because it authorize[d] relief 'regardless of whether there [was] competition between the parties or confusion as to the source of goods or services.'" *Service Merchandise Co. v. Service Jewelry Stores, Inc.*, 737 F. Supp. 983, 993 (S.D. Tex. 1990). The FTDA incorporated a similar standard into its original definition of dilution. *See* Pub. L. 104-98, § 4, 109 Stat. 985 (then-codified at 15 U.S.C. § 1127). The TDRA amendments eventually consolidated section 1127's definition into the primary dilution provision in section 1125(c).

dilution claim" under Texas law, then, a plaintiff need only "show that it owns a distinctive mark and that there is a likelihood of dilution." *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 278-279 (5th Cir. 2002).

### C. Cottonwood Owns Distinctive Marks

A mark demonstrates distinctiveness either inherently or through acquired secondary meaning. Whereas an inherently distinctive mark's "'intrinsic nature serves to identify a particular source,'" a mark with acquired distinctiveness "'has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of [the] mark is to identify the source of the product rather than the product itself.'" *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000)). A mark considered "incontestable" under the Lanham Act, *see* 15 U.S.C. § 1065, enjoys a "conclusive[] presum[ption]" that it has attained secondary meaning. *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980) (citing *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 377 (7th Cir. 1976)); *see also American Rice II*, 518 F.3d at 331; *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 794 n.5 (5th Cir. 1983) ("A mark that has become 'incontestable' under section 15 of the Lanham Act cannot be challenged as lacking secondary meaning, although it is subject to seven statutory defenses.") (internal citation omitted).

Secondary meaning and incontestable status generally concern only "descriptive" terms. *Zatarains*, 698 F.2d at 791 (citing *Soweco*, 617 F.2d at 1185 n.20).[18]  A descriptive term "identifies a characteristic or quality of an article or service and, though ordinarily not protectable, may become a valid trade name if it acquires a secondary meaning." *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979) (holding that "Vision Center" constituted a descriptive term when used to describe "a clinic providing optical goods and services" and, under the circumstances, lacked secondary meaning).  Proof of secondary meaning or incontestable status provides protection to descriptive marks.  Although a statutory presumption of validity results from registering the mark with the PTO, registration per se does not make a descriptive mark inherently distinctive. *See Amazing Spaces*, 608 F.3d at 237.  Thus, for trademark protection purposes, courts consider a descriptive mark that has acquired either secondary meaning or incontestable status distinctive regardless of the

---

[18]The Fifth Circuit has consistently applied the familiar *Abercrombie* trademark distinctiveness continuum in the context of word-based marks. *See Amazing Spaces*, 608 F.3d at 240-43; *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). The *Abercrombie* system classifies marks "in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection.  In contrast, generic marks – those that 'refe[r] to the genus of which the particular product is a species,' are not registrable as trademarks." *Id.* (citing *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S.189, 194 (1985) (internal citations omitted)).

mark's strength or weakness.[19]  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S.

189 (1985); *see also American Rice II*, 518 F.3d at 330-31 (describing protection afforded

by acquired secondary meaning and incontestable status); *accord Caliber Auto. Liquidators,*

*Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 939 (11th Cir. 2010)

(Higginbotham, J., sitting by designation) (holding that an incontestable mark is "'presumed

to be at least descriptive with secondary meaning, and therefore a relatively strong mark,'"

reversing a district court that had held "that the [incontestable] mark [at issue] was merely

descriptive and not entitled to strong protection" (quoting *Dieter v. B & H Indus. of Sw. Fla.,*

*Inc.*, 880 F.2d 322, 328-29 (11th Cir. 1989))).[20]

The Court finds that "CASH STORE" constitutes a distinctive descriptive mark.

"[S]tanding alone," the term "CASH STORE" "conveys information as to the characteristics

of the product," such that "even a consumer unfamiliar with the product would doubtless

have an idea of its purpose or function." *Zatarains*, 698 F.2d at 792; *see also Security*

---

[19]In light of the Texas statute's distinctiveness requirement, the Fifth Circuit, in *Advantage Rent-A-Car*, modified its prior guidance that state anti-dilution statutes "'protect only strong, well-recognized marks.'" 238 F.3d at 381 (quoting *Oxxford*, 109 F.3d at 1081 n.14).

[20]This creates some tension with – but does not alter – the Fifth Circuit's observation that "[i]ncontestable status does not make a weak mark strong." *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986).  The Court synthesizes the caselaw as supporting the following: (1) state anti-dilution statutes apply to both weak and strong marks; and (2) a mark's incontestable status makes it eligible for forms of protection traditionally reserved for strong or relatively strong marks, even if the mark in question possesses only moderate or relatively weak strength.  This comports with the relatively broad scope of Texas's anti-dilution statute, which does not require a showing of fame.

*Center, Ltd. v. First Nat. Sec. Ctrs*, 750 F.2d 1295, 1299 (5th Cir. 1985) ("To be descriptive, a term need only describe the essence of a business, rather than to spell out comprehensively all its adjunct services." (holding that "Security Center" constituted a descriptive term when used by businesses "provid[ing] secured storage facilities")).  It does not take an inferential leap to conclude that "CASH STORE" refers to a business location concerning money.  And, Cottonwood literally operates "stores" where consumers may obtain "cash."  Thus, "CASH STORE" represents a quintessential descriptive mark that, by itself, would not qualify for protection under either the Lanham Act or the Texas anti-dilution statute.  Cottonwood, however, has obtained incontestable status for various iterations of the mark, conclusively establishing secondary meaning for trademark protection purposes.[21]

Accordingly, although CSFS asks that the Court refrain from enforcing Cottonwood's marks here because "their conceptual and commercial weakness" and "widespread third-party use of [similar] marks" has rendered "their scope of protection" virtually nonexistent, its argument must fail.  Def.'s Mem. of Law in Opp. to Mot. for Prelim. Inj. at 6 [16] (hereinafter Def.'s Opp.).  A descriptive mark, even a weak one, enjoys some level of

---

[21]The Court considers Cottonwood's marks that technically lack incontestable status as functionally incontestable.  "It would be illogical to allow [CSFS] to claim that the phrase '[CASH STORE]' is merely descriptive with respect to the non-incontestable marks while the law conclusively presumes that the same phrase is *not* merely descriptive with respect to the incontestable mark[s]."  *Service Merchandise*, 737 F. Supp. at 992 (citing *In re Am. Sail Training Ass'n*, 230 U.S.P.Q. 879 (T.T.A.B. 1986)).  In any case, "for the purposes of this [preliminary injunction] motion only, CSFS does not dispute that Cottonwood's marks are protectable."  Def.'s Mem. of Law in Opp. to Mot. for Prelim. Inj. at 6 [16] [hereinafter Def.'s Opp.].

protection if it has obtained secondary meaning or incontestable status. As the Supreme Court held in *Park 'N Fly*, "the holder of a registered mark may rely on incontestability to enjoin infringement and . . . such an action may not be defended on the grounds that the mark is merely descriptive." 469 U.S. at 205.

### D. CSFS's Use of "CASH STORE" Will Likely Dilute Cottonwood's Trade Name

The Court now turns to examine whether Cottonwood shows a sufficient likelihood of dilution to justify entry of a preliminary injunction. In doing so, the Court looks to analogous caselaw concerning the FTDA and other state anti-dilution statutes containing a "likelihood of dilution" standard. This analysis leads the Court to distill eight factors relevant to determining dilution by blurring under the Texas statute. Under those factors, the Court finds that Cottonwood shows a substantial likelihood of dilution by blurring.

**1. The Court Construes the Texas Anti-Dilution Statute Consistently with the FTDA.**—Whether because of dilution's "nebulous" conceptual nature, *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983), or because courts generally treat it analytically as a fellow traveler with trademark infringement and unfair competition claims, *see, e.g.*, *Amazing Spaces*, 608 F.3d at 252 ("[O]ur discussion [of infringement] above disposes of the claim of service mark dilution."), courts interpreting the Texas anti-dilution statute have provided little guidance on what factors to weigh in establishing a likelihood of dilution.

The few Texas intermediate appellate courts to apply the Texas anti-dilution statute, however, do agree on a few general principles. Notionally, "[d]ilution involves the gradual 'whittling away' of a party's distinctive mark through unauthorized use by another." *Horseshoe Bay*, 53 S.W.3d at 812 (citing *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1564 (S.D. Tex.1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998)). And, "[d]ilution by blurring" – the type of dilution at issue here – "occurs only when the plaintiff's trade name is used by another as his own trade name, thereby weakening the plaintiff's ability to use the name as a unique identifier." *Express One*, 53 S.W.3d at 899 (citing *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1038 (S.D. Tex. 2001), *aff'd*, 286 F.3d 270 (5th Cir. 2002)) (further citations omitted). Beyond these broad doctrinal brushstrokes, no authority consulted by the Court has addressed directly the Texas statute's likelihood of dilution standard with finer detail. *See, e.g.*, *Pebble Beach*, 942 F. Supp. at 1567 (reasoning that for dilution by blurring "[i]f the plaintiff holds a distinctive trade mark, it is enough that the defendant has made significant use of a very similar mark" (quoting *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir. 1983))).

Although the Court reluctantly steps into this interpretive void, its *Erie* guess need not be a blind one. As implicitly recognized by at least one federal court, the TDRA caused the FTDA to more closely resemble the Texas anti-dilution statute. *See Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F. Supp. 2d 622, 642-43 (N.D.

Tex. 2009) (Kinkeade, J.).[22]  Both statutes contain a likelihood of dilution standard and apply

"regardless of whether there is competition between the parties or confusion as to the source

of goods or services."  Tex. Bus. & Com. Code § 16.29; *cf.* 15 U.S.C. § 1125(c)(1)

(injunctive relief available under the FTDA "regardless of the presence or absence of actual

or likely confusion, of competition, or of actual economic injury.").  Accordingly, the Court

looks to the FTDA and likelihood of dilution caselaw for interpretive guidance.

 **2. The Role of Confusion in Dilution Analysis.**—The FTDA now provides a

nonexclusive list of six factors courts should consider "[i]n determining whether a mark or

trade name is likely to cause dilution by blurring":[23]

> (i) The degree of similarity between the mark or trade name and the famous
> mark.  (ii) The degree of inherent or acquired distinctiveness of the famous
> mark.  (iii) The extent to which the owner of the famous mark is engaging in
> substantially exclusive use of the mark.  (iv) The degree of recognition of the
> famous mark.  (v) Whether the user of the mark or trade name intended to
> create an association with the famous mark.  (vi) Any actual association
> between the mark or trade name and the famous mark.

---

[22]The *Dallas Cowboys* Court referenced the FTDA's six dilution-by-blurring factors in analyzing a dilution claim brought under both federal and Texas law.  Although the court did not explicitly apply the blurring factors to the Texas law claim, it ultimately concluded that the plaintiffs "established dilution under federal and state law."  616 F. Supp. 2d at 643.  *Accord BankAmerica Corp. v. Nation's Bankers Mortg., Inc.*, 92 F. Supp. 2d 607, 612 (S.D. Tex. 1999) (looking to factors such as "renown" and "similarity" between the marks and services in conducting pre-TDRA Texas anti-dilution analysis).

[23]The FTDA defines "dilution by blurring" as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  *Cf. Express One*, 53 S.W.3d at 899 (holding that the plaintiff failed to show that its trade name "was weakened because the public associated the name with [the defendant] rather than [the plaintiff]").

15 U.S.C. § 1125(c)(2)(B)(i)-(vi). In perhaps the most commonly cited likelihood of dilution analysis, the Second Circuit synthesized various interpretations of New York State's anti-dilution statute into the six "Sweet" factors.[24] *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir. 1989) (Sweet, J., concurring) (noting that "courts have articulated the following factors in considering the likelihood of dilution caused by blurring: 1) similarity of the marks 2) similarity of the products covered by the marks 3) sophistication of consumers 4) predatory intent 5) renown of the senior mark 6) renown of the junior mark");[25] *see also New York Stock Exch. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (Sweet factors "determine the likelihood of blurring" under New York law).[26]

---

[24]Analyzing the then-recently enacted FTDA, the Second Circuit declined to make application of the Sweet factors the exclusive mode of analysis under the federal statute. *See Nabisco*, 191 F.3d at 227. The *Nabisco* Court reasoned that "in considering a new federal statutory right . . . courts would do better to feel their way from case to case, setting forth in each those factors that seem to bear on the resolution of that case, and, only eventually, to arrive at a consensus of relevant factors on the basis of this accumulated experience." *Id.* The *Nabisco* Court found the following factors relevant in its analysis: distinctiveness, similarity of the marks, proximity of the products and likelihood of bridging the gap, interrelationship among the distinctiveness of the senior mark/similarity of the junior mark/proximity of the products factors, shared consumers and geographic limitations, sophistication of consumers, actual confusion, adjectival or referential quality of the junior use, harm to the junior user and delay by the senior user, and effect of the senior user's prior laxity in protecting the mark. *Id.* at 217-22.

[25]Unless noted otherwise, all citations to *Mead Data* refer to Judge Sweet's concurrence.

[26]Although the Second Circuit usually applies the Sweet factors in conducting analysis under the New York anti-dilution standard, it does not apply all factors in every dilution case. *See Nabisco*, 191 F.3d at 227 n.8 (collecting cases).

Interpretations of the New York anti-dilution statute supply a relevant frame of reference here because the TDRA incorporated at least three Sweet factors into the FTDA's dilution-by-blurring provision.[27] And, the Fifth Circuit has used the New York statute as an interpretive lens to "constru[e]" the Texas statute because it "tracks in particular the language of the New York dilution statute." *Oxxford*, 109 F.3d at 1081 (citing NEW YORK GEN. BUS. L. § 368-d, *repealed by* L.1996, c. 319, § 2 (recodified as amended at NEW YORK GEN. BUS. L. § 360-l (providing for likelihood of dilution standard and allowing injunctive relief "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.")))).[28]

Commentators have criticized the Sweet factors for relying too heavily on elements derived from likelihood of confusion factors traditionally used to analyze trademark infringement and unfair competition claims. *See, e.g.*, *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 49 (1st Cir. 1998) (citing, *inter alia*, 3 MCCARTHY § 24:91); *see also Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 468-69 (7th Cir. 2000) (conducting dilution

---

[27]The Court considers the following TDRA and Sweet factors to overlap: (1) "degree of similarity between the mark or trade name and the famous mark," 15 U.S.C. § 1125(c)(2)(B)(i), and "similarity of the marks," 875 F.2d at 1035 (first Sweet factor); (2) "degree of recognition of the famous mark," 15 U.S.C. § 1125(c)(2)(B)(iv), and "renown of the senior mark," 875 F.2d at 1035 (fourth Sweet factor); and (3) "whether the user of the mark or trade name intended to create an association with the famous mark," 15 U.S.C. § 1125(c)(2)(B)(v), and "predatory intent," 875 F.2d at 1035 (fifth Sweet factor).

[28]Other courts have looked to Second Circuit caselaw for guidance in likelihood of dilution cases. *See, e.g.*, *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 505 (E.D. Va. 2006), *aff'd*, 507 F.3d 252 (4th Cir. 2007).

analysis consisting only of two Sweet factors: similarity of the marks and renown of the senior mark). In large part, this reflects a doctrinal schism over the compatibility of trademark infringement and dilution and the proper role of actual or potential confusion in dilution analysis.

One group of commentators – represented primarily by academics – views dilution as a limited cause of action for a narrow subset of cases not adequately addressed by traditional infringement. *See, e.g.*, 4 MCCARTHY § 24:68 ("It is my belief that the present state of antidilution law has been bloated far out of proportion to its original purpose and intent."); *see also* Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 YALE L.J. 1687, 1704 (1999) ("I think the modern dilution . . . cases take a good idea and stretch it too far."); *see generally* Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 HARV. L. REV. 813 (1927) (origin of dilution doctrine). For these authorities, confusion plays no role in establishing a likelihood of dilution. *See, e.g.*, 4 MCCARTHY § 24:72 (explaining that confusion concerns infringement actions).

On the other hand, another group of authorities – represented primarily by courts – considers dilution as intertwined with infringement and likelihood of confusion analysis. *See, e.g.*, *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 276 & n.16 (7th Cir. 1976) ("[Plaintiff's] claim for unfair competition and for trademark dilution are absorbed in a finding that trademark infringement, *i.e.*, a likelihood of confusion, deception, or mistake exists. . . . . A trademark likely to confuse is necessarily a trademark likely to dilute.");

Gerard N. Magliocca, *One and Inseparable: Dilution and Infringement in Trademark Law*, 85 MINN. L. REV. 949, 965-66 & nn.88-91 (2000-2001) ("Although dilution is often described as starting where the likelihood of confusion test leaves off, it is more accurate to say that infringement follows a fortiori from dilution. . . . It is almost impossible to think of any infringement situation that would not be covered by dilution.").[29] Under this approach, in which "dilution serves primarily as an infringement supplement, it follows that a dilution analysis should incorporate all of the elements of the likelihood of confusion test." *Id.* at 1019 n.355.[30]

On balance, the Court concludes that, whatever the merits of the academic argument against incorporating likelihood of confusion factors into courts' likelihood of dilution

---

[29] *See also Nabisco*, 191 F.3d at 219 ("Consumer confusion – the nub of an action for infringement – is, of course, unnecessary to show the actionable dilution of a famous mark. It does not follow, however, that dilution cannot be found in circumstances that would also support an action for infringement. Consumer confusion would undoubtedly dilute the distinctive selling power of a trademark."); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir. 1983) (requiring plaintiff to show injury "caused by actual or potential customer confusion" to establish likelihood of dilution and finding that lack of evidence of confusion in infringement analysis disposed of confusion requirement for dilution analysis). *But see Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 879 (9th Cir. 1999) (opining, prior to the TDRA, that "likelihood of confusion should not be considered under either the [FTDA]" or California law, but noting that "close parallels between [dilution and infringement analysis] are . . . not surprising").

[30] The Fifth Circuit uses a likelihood of confusion standard comprised of eight factors: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Oreck*, 803 F.2d at 170.

analyses, Congress mooted the debate as a practical matter when it enacted the TDRA.[31] *See*

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 25 cmt. f (1995-2010) ("Many of the

factors enumerated in § 21 as relevant to the likelihood of confusion are also relevant in

determining the likelihood of dilution.") [hereinafter RESTATEMENT (THIRD)].  Four of the

dilution by blurring factors incorporated into the TDRA overlap with likelihood of confusion

factors used by the Fifth Circuit.[32]  And, several federal courts considering dilution claims

post-TDRA have looked to confusion as a factor in their likelihood of dilution analyses.  *See,*

*e.g.*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009) (citing

confusion-based infringement analysis in *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d

373, 386 (2d Cir. 2005)); *see also Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634-36 (9th

Cir. 2008) (reversing district court's grant of summary judgment against Mattel's dilution

counterclaim when it had "shown a likelihood of confusion" between the "quite similar"

---

[31]*Cf. Ringling Bros.*, 170 F.3d at 464 (acknowledging that "the [Sweet factor analysis] process has obvious utility in making the long leaps of inference that can be used to find a mere 'likelihood of dilution,'" but finding them inappropriate under a pre-TDRA actual dilution standard); 4 MCCARTHY § 24:68 (ruing that "trademark owners induced Congress and the courts to allow more and more trademarks in more and more factual situations to jump on the antidilution bandwagon").

[32]*Compare* 15 U.S.C. § 1125(c)(2)(B)(i), (ii), (v) & (vi) ("The degree of similarity between the mark or trade name"; "The degree of inherent or acquired distinctiveness"; "Whether the user of the mark or trade name intended to create an association"; and "Any actual association between the mark or trade name"), *with Scott Fetzer*, 381 F.3d at 485 ("the similarity between the two marks"; "the type of mark allegedly infringed"; "the defendant's intent"; and "any evidence of actual confusion") (likelihood of confusion factors one, two, six, and seven).  The likelihood of confusion factor concerning "the type of mark" has also been construed as assessing the mark's strength.  *Oreck*, 803 F.2d at 170.

marks).[33]  The Court, therefore, will consider some likelihood of confusion factors in its likelihood of dilution analysis.[34]

### 3. The Court Finds a Likelihood of Dilution.

*3. The Court Finds a Likelihood of Dilution.*—In light of the TDRA, the text of the Texas statute, and interpretive caselaw, the Court looks to the six FTDA dilution-by-blurring factors, two of the overlapping Sweet factors and likelihood of confusion factors, and one additional likelihood of confusion factor in examining whether Cottonwood shows a likelihood of dilution.[35]  Because federal dilution law restricts its reach only to famous marks,

---

[33]The Ninth Circuit recently stated that "[d]ilution isn't confusion; quite the contrary. Dilution occurs when consumers form new and different associations with the plaintiff's mark." *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010) (citing *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002)).  This observation neither contradicts *Jada Toys* nor suggests that confusion cannot serve as a factor relevant in assessing whether dilution is likely to occur.  Rather, it simply reiterates that dilution primarily focuses on misassociation rather than confusion per se.  In fact, the *Visa* Court later cited two FTDA factors that overlap with likelihood of confusion analysis as particularly relevant in affirming the lower court's grant of summary judgment.  *Id.* (citing 15 U.S.C. § 1125(c)(2)(B)(i) & (ii)).

[34]The debate over confusion's place in dilution analysis has not gone unnoticed by the Fifth Circuit. In *Oxxford*, it observed that "[s]ome courts have found a third manner in which 'likelihood of dilution' may be proven under certain state statutes, namely an injury to the value of the mark caused by actual or potential confusion."  109 F.3d at 1081 n.15 (citing cases from the First, Second, and Tenth Circuits).  The *Oxxford* Court, however, took no side in the debate, reasoning that Texas's anti-dilution statute, "while it expressly declares that consumer confusion is not a prerequisite to the cause of action it creates, does not clearly indicate whether a cause of action premised upon actual or potential consumer confusion *alone* falls under its aegis."  *Id.* (emphasis added).  This Court, too, leaves that precise question for another day, but does decide that the presence of actual or potential confusion can affect whether certain activities create a likelihood of dilution.

[35]Courts have broad discretion in identifying and evaluating factors relevant to trademark infringement analysis.  *See, e.g.*, *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155,

the Court modifies the relevant FTDA factors to harmonize with Texas law's distinctiveness requirement. Accordingly, the Court finds the following factors are relevant to its dilution analysis: (1) the degree of similarity between the allegedly diluting mark or trade name and the distinctive mark; (2) the degree of inherent or acquired distinctiveness of the distinctive mark; (3) the extent to which the owner of the distinctive mark engages in substantially exclusive use of the mark; (4) the degree of recognition of the distinctive mark; (5) whether the user of the allegedly diluting mark or trade name intended to create an association with the distinctive mark; (6) any actual or potential association between the allegedly diluting mark or trade name and the distinctive mark; (7) the similarity of the products or services between users; and (8) the sophistication of consumers.[36] As emphasized by caselaw, the Court neither considers the factors of equal import nor affords any one dispositive authority.

---

1160-61 (5th Cir. 1982)). The Court extends this discretion to dilution analysis.

[36]This leaves unaddressed the Sweet and likelihood of confusion factors concerning renown of the junior mark (Sweet factor six), the identity of retail outlets and purchasers, the identity of advertising used, and the degree of care exercised by potential purchasers (likelihood of confusion factors four, five, and eight). As noted below, the Court considers the unaddressed likelihood of confusion factors as subsumed within its analysis of the factors concerning actual association or confusion and consumer sophistication.

Although perhaps relevant in a different case, the Court does not address the renown of CSFS's marks for two reasons. First, the renown that CSFS's marks may have accumulated within Canada and its other operating countries does not transfer automatically to the United States simply because CSFS decided to avail itself of U.S. capital markets. *Cf. Mother's Rests. Inc. v. Mother's Other Kitchen, Inc.*, 218 U.S.P.Q. 1046, 1048 (T.T.A.B. 1983). Second, little time has passed since CSFS listed its stock on the NYSE, making it unlikely to have already garnered renown in the United States. In any case, neither party has presented any evidence concerning CSFS's renown within the United States.

*See, e.g.*, *Elvis Presley*, 141 F.3d at 194 (citing *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).

*(a) degree of similarity between marks and trade names*[37]

"The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley*, 141 F.3d at 201 (citing *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir. 1987)). Because the FTDA's dilution-by-blurring analysis looks to the "degree of similarity," 15 U.S.C. § 1125(c)(2)(B)(i), a plaintiff need not show "substantial similarity" between the marks in question to invoke a dilution statute's protection absent statutory language indicating otherwise. *See Starbucks*, 588 F.3d at 108. Like the FTDA, the Texas anti-dilution statute's text lacks any suggestion that marks must meet a high threshold of similarity; indeed, notwithstanding the *Pebble Beach* Court's observation that the marks must be "'very similar,'" 942 F. Supp. at 1567 (quoting *Freedom Sav.*, 757 F.2d at 1186 (11th Cir.)), the Texas statute contains no mention of similarity.

Thus, "'[t]he relevant inquiry is whether, under the circumstances of the use,' the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Elvis Presley*, 141 F.3d at 201 (quoting RESTATEMENT

---

[37]The Court concludes that this FTDA factor overlaps with both the Sweet factor concerning "similarity of the marks" and the likelihood of confusion factor concerning "similarity between the two marks." *Compare* 15 U.S.C. § 1125(c)(2)(B)(i), *with Mead Data*, 875 F.2d at 1035-36, *and Scott Fetzer*, 381 F.3d at 485.

(THIRD) § 21 cmt. c; *accord* RESTATEMENT (THIRD) § 25 cmt. f. (noting that for likelihood

of dilution to exist, "the resemblance between the two [marks] must be sufficiently close that

the subsequent use evokes the requisite mental connection with the prior user's mark").

Ultimately, similarity turns on the marks' "total effect" or "overall impression." *Sun Banks*

*of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317-18 (5th Cir. 1981) (internal

quotation marks omitted) (citing, *inter alia*, *Armstrong Cork Co. v. World Carpets, Inc.*, 597

F.2d 496, 502 (5th Cir. 1979)).

Cottonwood and CSFS use identical trade names. And, both use marks prominently

featuring the phrase "cash store," albeit with aesthetic modifications that render the marks

otherwise dissimilar. Cottonwood's marks use "CASH STORE" in a variety of settings.

Cottonwood's earliest mark simply uses the phrase "THE CASH STORE" as a typed

drawing in capitalized font. *See* App. to Pl.'s Mot. for Prelim Inj. at 5 [11] [hereinafter Pl.'s

App.]; Compl. Ex. A. Another uses "CASH STORE" as a standard character mark in a

slightly styled form with all capital letters. *See* Pl.'s App. at 11; Compl. Ex. C. The most

suggestive design incorporates a modified dollar sign and exclamation mark into the "THE

CASH STORE," with the "!" superimposed over the "S" in "CASH" to form a dollar sign.

This design stacks the words "CASH" and "STORE" on top of each other, using the period

at the bottom of the exclamation mark to also serve as the "O" in "STORE." *See* Pl.'s App.

at 8; Compl. Ex. B. The most recently registered marks feature the words "CASH" and

"STORE" in various positions, sometimes back-to-back and other times with "CASH" placed

on top of "STORE."  These configurations use large, yellow block letters outlined in black with a black background.  *See* Pl.'s App. at 14-27; Compl. Exs. D-H.

CSFS uses its marks primarily in two contexts.  In the corporate context, CSFS uses the phrase "Cash Store FINANCIAL" in green text, with "Cash Store" in large lettering placed above the capitalized, but smaller, word "FINANCIAL."  A disc outlined in green with white interior partially envelopes the word "Store."  *See, e.g.*, App. to Def.'s Opp. at 216 [18 & 19] [hereinafter Def.'s App.]; Compl. Ex. I.  On CSFS's brick-and-mortar stores, it uses the phrase "The Cash Store" encircled by a yellow oval with green bordering.  The Canadian "maple leaf" sits adjacent to "Store."  The entire design rests above the phrase "CASH ADVANCE CENTERS" written in small, white block lettering.  *See* Def.'s App. at 207-11; Compl. Exs. J & K (the "CSFS store logo").  As used on CSFS's storefronts, the CSFS store logo sits alongside the trade name "The Cash Store" in large lettering.  *See, e.g.*, Def.'s App. at 217.

Because the parties use "effectively identical" trade names, *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010), the Court concludes that this factor weighs in favor of showing likelihood of dilution.  *See Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1036 (9th Cir. 2007) (noting that "use of an identical mark is itself circumstantial evidence" of dilution (citing *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003), *abrogated by statute on other grounds*, TDRA (codified at 15 U.S.C. § 1125(c)); *accord Savin Corp. v. Savin Grp.*, 391 F.3d 439, 452 & n.9 (2d Cir. 2004) (collecting cases).  The

addition of "Financial Services" to the end of CSFS's corporate marks, however, makes it unlikely that Cottonwood will succeed in enjoining CSFS's use of marks containing that term.

*(b) distinctive mark's degree of inherent or acquired distinctiveness*[38]

"This factor requires [the Court] to analyze how distinctive or 'unique' the mark[s] [are] to the public." *Citigroup, Inc. v. Capital City Bank Grp., Inc.*, 94 U.S.P.Q.2d 1645, 1668 (T.T.A.B. 2010). In analyzing a mark's degree of distinctiveness, courts consider, among other things, "'the inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question.'" *Star Indus.*, 412 F.3d at 385 (quoting 2 MCCARTHY § 11:81 (2005)).[39] In essence, then, this factor also assesses a mark's strength or weakness. *See, e.g.*, *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743-44 (2d Cir. 1998) ("The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source."). Generally, greater distinctiveness corresponds with a "greater . . . interest to be protected. And conversely, the more the senior mark tends toward the weak, common, quality-claiming, or prominence-claiming type, the more strongly that weakness would argue

---

[38]The Court concludes that this FTDA factor overlaps with the likelihood of confusion factor concerning "the type of mark allegedly infringed." *Compare* 15 U.S.C. § 1125(c)(2)(B)(ii), *with Scott Fetzer*, 381 F.3d at 485.

[39]Because the FTDA suggests courts analyze separately the extent of the mark owner's substantially exclusive use, 15 U.S.C. § 1125(c)(2)(B)(iii), the Court considers third-party usage in that context in the following subsection.

against a finding of dilution, especially if the senior use is in a distinctly different field."
*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 217 (2d Cir. 1999) (citing RESTATEMENT (THIRD) § 25 cmt. f). "[A] bare minimum of distinctiveness," however, will not suffice to invoke an anti-dilution statute's protection. *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001).

The Court finds this factor weighs in favor of finding a likelihood of dilution. As discussed above, the Court finds that Cottonwood's marks are descriptive and have acquired secondary meaning through incontestable or functionally incontestable status. This makes Cottonwood's marks protectable, but not necessarily highly distinctive or strong. Rather, combining the common words "cash" and "store" to describe a business engaged in short-term consumer lending verges on the quality-claiming. That CSFS and Cottonwood operate using identical trade names in the same broad field of commerce, however, counterbalances the "CASH STORE" marks' weakness. Thus, the Court finds Cottonwood's marks are moderately distinctive for its operating market.

### (c) extent of the distinctive mark owner's substantially exclusive use of the mark

This factor, unlike any other FTDA factor, does not overlap with either the Sweet or likelihood of confusion factors. The concept of substantially exclusive use originates from the acquired distinctiveness provisions of 15 U.S.C. § 1052 (f), which considers "proof of substantially exclusive and continuous use" of a mark "in commerce for the five years before the date on which the claim of distinctiveness is made" to constitute "prima facie evidence"

of distinctiveness. Requiring only "substantially" exclusive use "makes allowance for use by others which may be inconsequential or infringing and which therefore does not necessarily invalidate the applicant's claim.'" *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1352 (Fed. Cir. 1999) (quoting TMEP § 1212.05(b)).

Cottonwood claims that it enjoyed "exclusive owner[ship] and use[] of 'THE CASH STORE' family of marks for consumer lending services in the United States of America for the last 13 years." Pl.'s Br. to Mot. for Prelim. Inj. at 9. CSFS, however, points to numerous third parties using either the term "cash store" or its component words. Def.'s App. at 47-187. "In essence," CSFS argues that "the mere use of the words ['cash store'] in another mark would dilute [Cottonwood's] mark," and that evidence of third party use suggests that CSFS's use of "CASH STORE" "is not likely to cause any additional blurring." *Citigroup, Inc.*, 94 U.S.P.Q.2d at 1668.

CSFS's examples, however, do not show that Cottonwood engages in less than substantially exclusive use of the trade name "CASH STORE." Although many of CSFS's examples do use the term "cash store" or the words "cash" and "store" as part of their trade names, none appears to rise above the level of "inconsequential."[40] Many examples either do not operate in the same seven states as Cottonwood or consist of small, single location

---

[40]Cottonwood's registrations with the PTO expressly disclaim the exclusive right to use the term "cash" except as used in Cottonwood's "CASH STORE" marks.

operations with a handful of employees.[41]  Most examples, such as "America's Cash Store,"
use other descriptive words to modify the term "cash store," often placing emphasis on these
other words.  *See, e.g.*, Def.'s App. at 61-63 (emphasizing word "America's" in larger type
and prominence than term "Cash Store").  The trade names of the few large payday lenders
of national scope cited by CSFS only share the generic word "store," *see id.* at 139-47 ("The
Money Store" and "National Money Store"), or otherwise modify "cash" in a manner
distinguishable from Cottonwood's marks.  *See id.* at 148-87 ("Cash America").  And, the
example most analogous to Cottonwood's marks, "The Cash Store Pawn Shop," which uses
a yellow and black, block-lettered design for its trade name and sometimes refers to itself as
"The Cash Store," appears to operate out of only one location in Fairfax, Virginia.  *See id.*
at 70-75.  Cottonwood, however, does not operate in Virginia.

Ultimately, CSFS fails to point out any other entity's use of "CASH STORE" as the
entirety of that entity's trade name or service marks except for CSFS itself.  Accordingly, the
Court finds that Cottonwood has enjoyed substantially exclusive use of the "CASH STORE"
trade name and marks.

---

[41]*See* Exs. B-W to Glover Aff. in Def.'s App at 47-187.

### (d) distinctive mark's degree of recognition[42]

Although under the FTDA this factor "seems redundant in view of the fact that [a plaintiff] must establish that its mark is famous as a prerequisite for establishing a dilution claim," the Court finds this factor useful under Texas law analysis to "determine the level of [recognition] acquired by the [distinctive] mark." *Citigroup*, 94 U.S.P.Q.2d at 1668. "In other words," once a plaintiff establishes that its mark qualifies as distinctive and within the protective ambit of Texas's anti-dilution statute, the Court "appl[lies] a sliding scale to determine the extent of that protection (*i.e.*, the more [recognized] the mark, the more likely there will be an association between the [distinctive] mark and the defendant's mark)." *Id.* Given the close relationship between distinctiveness and fame, the Court looks to factors similar to those used in analyzing a mark's claim to fame under federal law.[43] A mark need only to have garnered recognition within a given market or geographic area, not nationwide. *See Advantage Rent-A-Car*, 238 F.3d at 380; *see also Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 965 (6th Cir. 1987) (citing *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108 (S.D.N.Y. 1981)); *Mead Data*, 875 F.2d at 1038 ("[A] mark can

---

[42]The Court concludes that this FTDA factor overlaps with the Sweet factor concerning "renown of the senior mark." *Compare* 15 U.S.C. § 1125(c)(2)(B)(iv), *with Mead Data*, 875 F.2d at 1035, 1038.

[43]*See Advantage Rent-A-Car*, 238 F.3d at 381 (noting that, in distinctiveness analysis under Texas anti-dilution law, the courts "consider[] factors much like those used in the FTDA fame analysis: whether the mark is arbitrary, the length of time the user has employed the mark, the scope of the user's advertising and promotions, the nature and extent of the first user's business, and the scope of the first user's reputation").

be strong enough to warrant protection from dilution without being 'famous' or nationally renowned.").

Cottonwood's marks likely enjoy a moderate degree of recognition among payday loan consumers in its areas of operations. Cottonwood has provided no survey data or other direct evidence of consumer association or identification of its marks,[44] but it has presented circumstantial evidence of consumer recognition. Cottonwood operates over 270 "CASH STORE" lending centers in seven states, almost half in Texas, and has spent almost $50 million in advertising over the past decade. Cottonwood has advertised the CASH STORE marks through its website and a variety of print and visual media sources, including the sponsorship of athletic teams and community service activities. Pl.'s App. at 41-42. Based on these activities, the Court finds that a significant portion of the payday-loan consuming public in Cottonwood's operating areas would recognize the "CASH STORE" marks and associate them with its "CASH STORE" services. *See, e.g.*, *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (noting that descriptive marks "'may be strengthened by such factors as extensive advertising, length of exclusive use, [and] public

---

[44]"Direct evidence of a dilution of distinctiveness is seldom available because the harm at issue is a blurring of the mental associations evoked by the mark, a phenomenon not easily sampled by consumer surveys and not normally manifested by unambiguous consumer behavior." RESTATEMENT (THIRD) § 25 cmt. f. "In most instances this [likelihood of dilution] determination must rest on inferences drawn from the market context in which the use occurs." *Id.*

recognition'" (quoting *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991))).

*(e) defendant's intent to create association*[45]

"In some situations, '[a] showing that the defendant intended to use the allegedly infringing mark with knowledge of the predecessor's mark may give rise to a presumption that the defendant intended to cause public confusion.'" *Scott Fetzer*, 381 F.3d at 486 (quoting *Conan Props.*, 752 F.2d at 151 n.2). This "[p]redatory intent," however, must "involve[] more than mere knowledge of the senior mark – it requires a showing that the junior user adopted its mark hoping to benefit commercially from association with the senior mark." *Mead Data*, 875 F.2d at 1037. If present, predatory intent "provides strong evidence of the likelihood of blurring." *Id.*

Nothing in the record as currently developed shows that CSFS acted with predatory intent in adopting the trade name "Cash Store" or in listing CSFS on the NYSE. Cottonwood first used the service mark "THE CASH STORE" in commerce in 1997 and obtained listing on the Principal Register in 1999. Pl.'s App. at 5. Cottonwood points to CSFS's incorporation as "B&B Capital Corporation" in 2001 and subsequent name changes – first to "Rentcash, Inc." and then to CSFS in 2008 – apparently to imply that CSFS acted with bad

---

[45]The Court concludes that this FTDA factor overlaps with both the Sweet factor concerning "predatory intent" and the likelihood of confusion factor concerning the "defendant's intent." *Compare* 15 U.S.C. § 1125(c)(2)(B)(v), *with Mead Data*, 875 F.2d at 1035, 1037-38 *and Scott Fetzer*, 381 F.3d at 485.

faith in using its "Cash Store" marks.  *See* Mot. for Prelim. Inj. at 1, 4.  CSFS, however,

registered the CSFS store logo as a Canadian trademark in 2001, well before Cottonwood

suggests that CSFS became aware of the "CASH STORE" marks.  Def.'s App. at 207-09

(Canadian Service Mark Certificate).  Other than timing, Cottonwood provides no other

actual or circumstantial evidence showing predatory intent, let alone bad faith,[46] by CSFS.

The Court finds that this factor weighs in CSFS's favor; that, however, does not "relieve it

of liability if other factors support a finding of blurring."  *Mead Data*, 875 F.2d at 1037;

*accord Oreck Corp. v. U.S. Floor Sys. Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (assessing

defendant's intent in infringement case).

*(f) actual association between the marks or trade names*[47]

Cottonwood has presented no evidence of actual association between its marks and

CSFS's marks.  As with a lack of actual confusion in likelihood of confusion analysis,

---

[46]Although a presumption of predatory intent results naturally from finding that a defendant acted in bad faith, a plaintiff need not establish bad faith for this factor to weigh in favor of a likelihood of dilution.  *See, e.g.*, *Starbucks*, 588 F.3d at 109 (holding that the FTDA's plain language "requires only the consideration of '[w]hether the user of the mark or trade name intended to create an association with the famous mark'" regardless of "whether bad faith corresponded with that intent" (quoting 15 U.S.C. § 1125 (c)(2)(B)(v))).

[47]The Court concludes that this FTDA factor overlaps with the likelihood of confusion factor concerning "evidence of actual confusion" and subsumes the factors concerning "identity of retail outlets and purchasers," "degree of care exercised by potential purchasers," and the "identity of advertising media used."  *Compare* 15 U.S.C. § 1125(c)(2)(B)(vi), *with* *Oreck*, 803 F.2d at 170.

however, this does not make association unlikely.[48] There has been little time for consumers to associate Cottonwood and CSFS's marks. Although CSFS has participated in investment solicitation activity in the United States for several years, until recently it sold its stock exclusively on the Toronto Stock Exchange. Thus, the only U.S.-based consumers likely to encounter CSFS's marks consisted of a relatively limited audience of professional investors.

By expanding its investment solicitation activities to the NYSE, however, CSFS increased the likelihood that its U.S.-directed communications would reach a much broader audience, including consumers who follow the stock markets generally and who may individually invest and trade in stocks through internet-based platforms targeted at the general public. To the extent these individual investors live in areas containing Cottonwood's "CASH STORE" lending centers, read any of the newspapers or other media to which CSFS sends press releases, or are "CASH STORE" customers, they are likely to associate CSFS's marks with Cottonwood's. *Cf. Nabisco*, 191 F.3d at 220 ("If the consumers who buy the products of the senior user never see the junior user's products *or publicity*, then those consumers will continue to perceive the senior user's mark as unique, notwithstanding the junior use." (emphasis added) (citing RESTATEMENT (THIRD) § 25 cmt. f ("If the goods

---

[48]At least one court has gone so far as to suggest that the FTDA's factors render direct evidence nonessential to a dilution-by-blurring claim's ultimate success. *See Visa Int'l*, 610 F.3d at 1091 ("[A] plaintiff seeking to establish a likelihood of dilution is not required to go to the expense of producing expert testimony or market surveys; it may rely entirely on the characteristics of the marks at issue." (citing 15 U.S.C. § 1125(c)(2)(B))).

are marketed in different stores to different buyers . . . a connection between the prior and subsequent use may be unlikely."))).

"[T]he introduction of the [CSFS] mark[s] to the marketplace means that there are now two products, and not just one, competing for association" with the trade name "CASH STORE." *Visa Int'l*, 610 F.3d at 1091. Thus, although Cottonwood has not introduced direct evidence of actual association, it has shown sufficiently that such association is likely. Combined with the procedural posture of the case at this juncture – which requires the Court to assess Cottonwood's *likelihood* of success on the merits of showing a *likelihood* of dilution – the Court finds this factor tilts in Cottonwood's favor.

*(g) similarity of the users' products and services*[49]

Moving away from the FTDA factors, the Court looks to a Sweet factor found in both *Mead Data* dilution and likelihood of confusion infringement analyses and examines the similarity of Cottonwood's and CSFS's services. Although "[s]ome courts and commentators have questioned the relevance of similarity of products because the [FTDA's] 'primary purpose was to apply in cases of widely differing goods,'" the Court sides with those authorities reasoning that "[t]he closer the junior user comes to the senior's area of commerce, the more likely it is that dilution will result from the use of a similar mark."

---

[49]The Court concludes that this Sweet factor overlaps with the likelihood of confusion factor concerning "similarity of the products or services." *Compare Mead Data*, 875 F.2d at 1035-36, *with Scott Fetzer*, 381 F.3d at 485.

*Nabisco*, 191 F.3d at 218-19 (quoting *Lund Trading*, 163 F.3d at 49 ).[50]  After all, "'[t]he greater the similarity between products and services, the greater the likelihood of confusion.'" *Elvis Presley*, 141 F.3d at 202 (quoting *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)); *see also Mead Data*, 875 F.2d at 1036 ("Similarity of the products covered by the marks increases the likelihood of blurring."). And, activities that cause confusion "undoubtedly dilute the distinctive selling power of a trademark." *Nabisco*, 191 F.3d at 219.

The Texas statute's plain language bolsters this approach.  A plaintiff may obtain injunctive relief under Texas anti-dilution law "regardless of whether there is competition between the parties." TEX. BUS. & COM. CODE § 16.29.  The phrase "regardless of whether" connotes a choice of alternatives.  Read another way, then, the statute reaches uses "whether or not" competition exists.  Courts interpreting New York's analogous statute have construed it to provide similarly.  *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (2d Cir. 1993) (holding that New York statute reaches "competitors as well as noncompetitors"); *Pebble Beach*, 942

---

[50]So far as the Court can determine, the Fifth Circuit has not modified its nearly forty year-old observation that dilution is "most applicable" to situations involving a "product so dissimilar . . . that there is no likelihood of confusion of the products or sources, but where the use of the trademark . . . will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark." *Holiday Inns, Inc. v. Holiday Out In Am.*, 481 F.2d 445, 450 (5th Cir. 1973) (looking to the then-current version of the Florida anti-dilution statute).  In light of subsequent developments that have expanded the reach of dilution doctrine, the enactment and amendment of both state and federal anti-dilution statutory provisions, and the *Holiday Inns* Court's permissive "most applicable" language, the Court concludes that applying dilution to the identical services at issue here best aligns with the current state of dilution law.

F. Supp. at 1564 & nn.46-47.[51] The FTDA contains nearly identical language, *see* 15 U.S.C.

§ 1125(c)(1) (applying "regardless of the presence or absence of . . . competition"), and

courts have interpreted it, too, to include competitors' products and services. *See, e.g.*,

*Nabisco*, 191 F.3d at 223 (extending *Nikon*'s holding to the FTDA context).

CSFS contends that it has no intention of expanding its operations to the United States

and that it limits its U.S.-based activities to investment solicitation activities directed at a

narrow niche of highly sophisticated consumers, namely, investment professionals. *See*

Def.'s Opp. at 2, 6 & n.1. Thus, according to CSFS, its services do not currently and are

unlikely to ever overlap with those provided by Cottonwood's "CASH STORE" centers. *Id.*

at 11-13.

None of these arguments change the fact that Cottonwood and CSFS both engage

in "payday"-style, short-term consumer lending in their respective countries. "In this

fundamental sense," therefore, Cottonwood and CSFS participate "in the same line of

commerce." *Dreyfus Fund*, 525 F. Supp. at 1118.[52] Accordingly, although CSFS and

---

[51]*See also Starbucks*, 588 F.3d at 114 (explaining that courts use the Sweet factors, which looks to the "similarity of products" in "determining dilution by blurring under New York law" (citing *New York Stock Exchange*, 293 F.3d at 558)).

[52]*Dreyfus Fund* has special relevance here because it involved a similar dispute between two banking entities – one Canadian and one American – that resulted in the entry of a preliminary injunction. The Royal Bank of Canada, which had used lions in its Canadian marks for some time, launched an advertising campaign directed at U.S.-based consumers that featured lions resembling those used by the Dreyfus Fund in its U.S. advertising campaigns. Dreyfus brought claims for trademark infringement, unfair competition, and dilution under the New York statute.

Cottonwood are not engaged in direct competition currently, "the potential for competition between these two entities is substantial." *Id.* at 1119. "Though [CSFS] may disavow an intent to expand, it does not disavow the possibility." *Id.* (internal citations omitted). And, based on the extent of CSFS's operations "in Canada and other nations, an increase in recognition within the United States would contribute to the feasibility of extending its services here." *Id.* (internal citation omitted). Because this "'expansion of business factor turns . . . on whether it is reasonable for the ordinary purchaser to assume such expansion,'" *id.* at 1119-20 (quoting *E.I. Dupont de Nemours and Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502, 517-18 (E.D.N.Y. 1975)), the identical nature of the services at issue here constitutes "evidence probative of the likelihood that consumers might be confused by [CSFS's] use of a mark very similar to [those] owned by [Cottonwood]." *Id.* at 1119.

"In short, irrespective of the absence of direct competition between [CSFS and Cottonwood], they are in an area of commercial activity where consumers will perceive a

---

Notably, the *Dreyfus Fund* Court meshed its infringement and dilution analyses, which considered the marks' strengths and similarities, the similarity of the parties' services, the defendant's intent, and the "sophistication of purchasers." 525 F. Supp. at 1112-25. Indeed, the court, citing a growing trend of applying dilution protection, went so far as to observe that Dreyfus "raised a substantial federal claim based upon dilution," even though the FTDA would not be enacted for another fifteen years. *Id.* at 1123-24. And, in regards to Dreyfus's state law dilution claim, the court reasoned that "[t]he findings and conclusions reached with respect to the trademark cause of action make it highly likely that the New York statute has been violated. If anything, the likelihood of violation of [the New York statute] is greater than of the Lanham Act." *Id.* at 1125.

Ultimately, the *Dreyfus Fund* Court enjoined the Royal Bank of Canada "from utilizing lions such as those used by Dreyfus, in any advertising with significant exposure in the United States." *Id.* at 1126.

substantial degree of competitive (and cooperative) overlap." *Id.* at 1120. Accordingly, the

Court finds that this factor also weighs in favor of a likelihood of dilution.

### (h) consumer sophistication[53]

"Consumers who are highly familiar with the particular market segment are less likely

to be confused by similar marks and may discern quite subtle distinctions. Conversely,

unsophisticated customers lack this discrimination and are more vulnerable to the confusion,

mistake, and misassociations against which the trademark law protects." *Nabisco*, 191 F.3d

at 220; *cf. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir. 1980)

("Dissimilarities between the retail outlets for and the predominant consumers of plaintiff's

and defendants' goods lessen the possibility of confusion, mistake, or deception."). Dilution

may occur and injunctive remedies may follow, however, even when both parties serve or

direct their advertising and activities towards sophisticated consumers. *See, e.g.*,

*Westchester*, 214 F.3d at 674. The level of consumer sophistication determines the scope –

not availability – of injunctive relief. *Id.* (vacating and remanding when district court, in case

concerning "relatively sophisticated buyers," rejected imposing limited injunctive relief of

a disclaimer, noting that "[s]uch buyers are more likely to notice, read, and understand the

import of any written disclaimers"); *accord Dreyfus Fund*, 525 F. Supp. at 1121-25 (entering

---

[53]The Court concludes that this Sweet factor overlaps with the likelihood of confusion factors concerning the "identity of retail outlets and purchasers," the "degree of care exercised by potential purchasers," and the "identity of advertising media used." *Compare Mead Data*, 875 F.2d at 1035-37, *with Oreck*, 803 F.2d at 170.

preliminary injunction against Canadian bank ostensibly targeting highly sophisticated, U.S.-based "'financial decision makers in multinational corporations having annual sales of more than $1,000,000'" (citing party brief)).

The parties dispute the appropriate target audience here. CSFS contends that the Court should focus on its activities' effect on only a relatively narrow slice of professional investors whose high level of sophistication makes it unlikely that they will associate or confuse Cottonwood's U.S.-only "CASH STORE" marks with CSFS's Canadian operations. Def.'s Opp. at 2-3. Cottonwood apparently agrees that such consumers figure into the Court's analysis, but claims that its relatively less sophisticated brick-and-mortar "CASH STORE" customers also constitute a relevant consumer market. Mot. for Prelim. Inj. at 13.

Regardless of whether the ultimate audience here consists of sophisticated or unsophisticated consumers, this factor weighs in favor of finding a likelihood of dilution. As an initial matter, even if CSFS targeted and reached only a professional investing class of consumers as it professes, this alone would not insulate its activities from more limited forms of injunctive relief. *See, e.g.*, *Westchester*, 214 F.3d at 674. Furthermore, "whatever [CSFS's] alleged target may be, its advertising campaign is designed to reach the entire financial community of the United States, including many consumers . . . who are far less sophisticated than corporate managers." *Dreyfus Fund*, 525 F. Supp. at 1122.

If CSFS continued to offer its stock only on the Toronto Stock Exchange or refrained from sending press releases to numerous mainstream media publications, its sophisticated

investor argument might carry more persuasive force. But, in deciding to expand its base of capital by facilitating stock purchases through the NYSE, CSFS broadened the potential solicitation audience to include any U.S.-based consumer who follows the American stock markets generally or even simply reads the business section of any number of newspapers or other media outlets. *See* Def.'s App. at 223-31 (distribution list for CSFS press releases and other communications) & 705-817 (press release examples). These consumers likely span the spectrum from CSFS's envisioned sophisticated consumers to breakfast-table speculators plunging into securities for the first time on the basis of a friend's hot stock tip. Where the former might notice that CSFS's "Cash Stores" operate outside of the United States or conduct further research, the latter probably will not distinguish CSFS's "Cash Stores" from the "CASH STORE" locations cropping up across Cottonwood's seven state operating area. These consumers are also unlikely to attend investor conferences and hear CSFS officers describe its expansion in Canada and other markets, but not the United States.

With both audiences, dilution likely occurs to Cottonwood's marks "because [their] distinctiveness in the minds of consumers is undermined" and the mark "loses its advertising value." *Dreyfus Fund*, 525 F. Supp. at 1123. For unsophisticated consumers, CSFS's "advertising could be detrimental to [Cottonwood] in that potential customers could be confused as to the source of the services offered, or as to sponsorship. [These] [c]onsumers might conclude after seeing the ads . . . that a connection exists between" the parties. *Id.* at 1122. And, Cottonwood's marks may be diluted even among sophisticated consumers "when

[such] consumers see [marks] that they initially associate with [Cottonwood], but that they subsequently realize are being used to advertise some other product or enterprise. Any consumer so exposed will thereafter less readily identify ["CASH STORE"] in financially oriented ads with" Cottonwood. *Id.* at 1123; *see also Visa Int'l*, 610 F.3d at 1091.

### *(i) actual or potential confusion*[54]

Although "neither actual confusion nor likelihood of confusion is necessary to sustain an action for dilution, it does not follow that actual confusion cannot be highly probative of dilution. Confusion lessens distinction. When consumers confuse the junior mark with the senior, blurring has occurred." *Nabisco*, 191 F.3d at 221; *see also Amstar*, 615 F.2d at 263 (actual confusion presents "best evidence of likelihood of confusion" (citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975))).

Cottonwood provides no evidence of actual confusion, but this "does not undermine evidence of trademark dilution." *Starbucks*, 588 F.3d at 109 (quoting *Nabisco*, 191 F.3d at 221 ("[T]he absence of confusion 'has no probative value' in dilution analysis.")). Like the FTDA, the Texas anti-dilution statute applies whether or not evidence of actual confusion exists. Based on the foregoing factors, the Court concludes that Cottonwood has a high probability of establishing a likelihood of confusion. And, given the early stage of this

---

[54]The Court concludes that this likelihood of confusion factor overlaps with the FTDA factor concerning "actual association" and subsumes the factors concerning "identity of retail outlets and purchasers," "degree of care exercised by potential purchasers," and the "identity of advertising media used." *Compare* 15 U.S.C. § 1125(c)(2)(B)(vi), *with Oreck*, 803 F.2d at 170.

litigation, the possibility – if not probability – remains that discovery may reveal evidence of actual confusion. Because Cottonwood has shown the existence of at least potential confusion, the Court finds this factor weighs in favor of finding a likelihood of dilution by blurring.

### 4. Conclusion on the Likelihood of Dilution Factors.

—The Court finds that Cottonwood demonstrates a substantial likelihood of success on the merits of its Texas law dilution claim. The "CASH STORE" marks are distinctive, and CSFS's activities are likely to dilute Cottonwood's marks because "[e]ven in the absence of consumer confusion, an unauthorized user's adoption of another's mark lessens that mark's capacity to identify the true owner's goods and services." *Horseshoe Bay*, 53 S.W.3d at 812 (citing *Pebble Beach*, 942 F. Supp. at 1567). "[T]he introduction of [CSFS's] mark[s] to the marketplace means that there are now two products, and not just one, competing for association with that [term]. This is the quintessential harm addressed by anti-dilution law." *Visa Int'l*, 610 F.3d at 1091. Moreover, the above factors also show a likelihood of confusion; this makes dilution even more likely.

### E. Cottonwood Shows a Substantial Threat that It Will Suffer Irreparable Injury

"[A]n 'injury is 'irreparable' only if it cannot be undone through monetary remedies.'"

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)). Although the majority of circuits have "held that a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case," *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) (collecting cases), Fifth Circuit precedent precludes a "presumption of irreparable injury" even when the movant shows a substantial likelihood of success on the merits. *Id.* (quoting *S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 188 (5th Cir. Unit B 1982)).

Because dilution gradually "whittles away" a mark's uniqueness and distinctive selling power, its harm accrues over time. The longer the defendant uses the diluting mark, the more time the public has to associate the plaintiff's mark with another's goods or services. *See Visa Int'l*, 610 F.3d at 1090-91. Once made, those associations neither can be undone nor remedied by cash payment. Accordingly, the Court finds that Cottonwood has a threat it will suffer irreparable injury because any uses of the "CASH STORE" marks by CSFS in the United States constitute "acts" that will "likely dilute" Cottonwood's marks. TEX. BUS. & COM. CODE § 16.29.

### F. Injury to Cottonwood Outweighs any Potential Injury to CSFS

Because the Court authorizes only limited relief, the injunction will likely cause CSFS minimal harm. The injunction only requires CSFS to refrain from identifying itself solely as "The Cash Store" or "Cash Store" and to incorporate a disclaimer into its regulatory filings and investment solicitation activities. Cottonwood, on the other hand, likely suffers accruing and ongoing injury to its marks. Although CSFS argues that the Court must restrict any injunctive relief to Cottonwood's seven-state operating area and its natural "zone of expansion," *see Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842 n.6 (5th Cir. 1990) (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959)), the Court believes that requiring CSFS to follow the injunction only in its regulatory filings and investment solicitation activities directed at those seven states would create administrative difficulties greater than simply requiring CSFS to modify its identification and include the disclaimer in all such activity.[55] Accordingly, the Court finds that the prospective injury to Cottonwood if no relief is afforded outweighs any potential injury to CSFS from the limited injunctive relief the Court provides.

---

[55]The nationwide application of Texas anti-dilution law presents complex choice of law issues. Under a most significant contacts analysis, the Texas statute arguably does apply to CSFS's activities because they are "acts" that both affect a Texas resident and cause effects within the State of Texas. And, Cottonwood operates the bulk of its stores in Texas. Because the parties assume that Texas anti-dilution law controls here, the Court will not second guess their choice.

### G. A Limited Injunction Serves the Public Interest

In line with trademark law's interest with protecting the public from deception, confusion, and misassociation, the injunction here will aid the public in distinguishing between Cottonwood and CSFS and their respective marks. *See, e.g.*, *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 734 (7th Cir. 1998) (Wood, J., dissenting) ("'[I]n trademark infringement cases . . . the relevant consideration in determining whether the public interest will be disserved by the grant of an injunction is the consumer's interest in not being deceived . . . .'" (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 n.8 (7th Cir.1988))).

### H. Conclusion Concerning Cottonwood's Motion for a Preliminary Injunction

Because Cottonwood satisfies the requisite elements for a preliminary injunction to issue, the Court grants Cottonwood's motion. The Court finds that Cottonwood sufficiently demonstrates a substantial likelihood of success in showing that CSFS's investment solicitation activities are acts likely to dilute its "CASH STORE" marks. And, because the harm caused by misassociation accrues over time and cannot be remedied through money damages, the Court finds that Cottonwood shows a substantial threat of irreparable injury.

The Court, however, acknowledges the force of many of CSFS's arguments and grants limited relief. The Court thus enjoins CSFS from referring to itself as "Cash Store" or "The Cash Store" in its communications directed to the United States, but permits it to refer to itself as "Cash Store Financial," "Cash Store Financial Services," "CSF," or "CSFS." By

emphasizing the "Financial Services" component of its trade name, CSFS will reduce the possibility of the general public misassociating its marks with Cottonwood's marks. Likewise the Court requires CSFS to include a conspicuous disclaimer of its lack of affiliation with Cottonwood and its absence from the U.S. retail market. The disclaimer will mitigate misassociation among relatively more sophisticated consumers in the financial and investment services world. At the same time, the Court also balances the relief granted in Cottonwood's favor by allowing CSFS to continue including photos and illustrations of its Cash Store locations outside the United States in its investment solicitation materials. The Court finds that this tailoring of relief in proportion to the limited scope of the threatened injury adequately addresses the balance of harms between the parties. Finally, the Court finds that a limited injunction serves the public interest by preventing misassociation of the parties' marks.

## V. THE COURT RETAINS JURISDICTION OVER COTTONWOOD'S TEXAS LAW CLAIMS

Although the Fifth Circuit has a "'general rule'" that a court should "decline to exercise jurisdiction over pendent state-law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial," *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999), the Court opts to retain jurisdiction in this case. In deciding whether to exercise pendent jurisdiction over state law claims, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350

(1988).  In doing so, however, "[n]o single factor . . . is dispositive." *Parker & Parsley*

*Petroleum Co., v. Dresser Indus*, 972 F.2d 580, 587 (5th Cir. 1992).  Rather, pendent

jurisdiction "is a doctrine of flexibility, designed to allow courts to deal with cases involving

pendent claims in the manner that most sensibly accommodates a range of concerns and

values." *Carnegie-Mellon*, 484 U.S. at 350.

These factors militate in favor of exercising pendent jurisdiction.  The Court has spent

a good deal of judicial resources researching and analyzing caselaw and other authorities in

light of the unique transnational facts at issue here.  As a result, the Court has acquired

special familiarity with both Cottonwood's claim for dilution under Texas law and a host of

complex issues presented in the various briefs and appendices submitted in conjunction with

the motions addressed in this Order.  A state court likely would have difficulty in achieving

equal familiarity in short order.  *See Parker & Parsley*, 927 F.2d at 587 (citing *Shaffer v. Bd.*

*of Sch. Dirs.*, 730 F.2d 910, 912 (3d Cir. 1984)).  And, exercising jurisdiction does not

implicate comity concerns here because federal courts routinely consider claims under the

Texas anti-dilution statute brought in conjunction with Lanham Act claims.  *See, e.g.*,

*Amazing Spaces*, 608 F.3d 225.

## CONCLUSION

The Court grants Cottonwood's motion for a preliminary injunction and grants in part

and denies in part CSFS's motion to dismiss.

Signed March 31, 2011.

David C. Godbey
United States District Judge